## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| GARLAND SEXTON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:24-cv-350 |
| | § | |
| EQUIFAX INFORMATION SERVICES LLC, | § | With Jury Demand Endorsed |
| EXPERIAN INFORMATION SOLUTIONS, | § | |
| Inc., TRANS UNION LLC, and | § | |
| NATIONSTAR MORTGAGE LLC, | § | |
| successor by merger to RUSHMORE LOAN | § | |
| MANAGEMENT SERVICES, LLC, | § | |
| | § | |
| Defendants. | § | |

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff, Garland Sexton ("Plaintiff"), by and through counsel, for his Complaint against Defendants Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, and Nationstar Mortgage LLC, successor by merger to Rushmore Loan Management Services, jointly, severally, and in solido, state as follows:

## I. INTRODUCTION

1. Three of the Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., and Trans Union LLC are consumer reporting agencies ("CRA" or "CRAs") as defined by 15 U.S.C. § 1681a(f), and the other Defendant, Nationstar Mortgage LLC, successor by merger to Rushmore Loan Management Services, is a furnisher of consumer information. All Defendants have violated 15 U.S.C. § 1681 *et seq.*, known as the Fair Credit Reporting Act (the "FCRA"). Plaintiff seeks to recover from Defendants actual, statutory, and

punitive damages, injunctive relief, legal fees, and expenses.

## II.  PARTIES

2.      Plaintiff, Garland Sexton, is a natural person residing in the City of Petersburg, County of Monroe, State of Michigan, is a "consumer," as defined by the FCRA, 15 U.S.C. § 1681a(c)**,** and is a victim of repeated false credit reporting.

**Made Defendants herein are**:

3.      Upon information and belief, Defendant Equifax Information Services LLC, which may also hereinafter be referred to as "Equifax," "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is a Georgia limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its headquarters, 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309.  Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation.

4.      Upon information and belief, Defendant Experian Information Solutions, Inc., which may also hereinafter be referred to as "Experian", "Defendant," "Defendants," "CRA," or "CRA Defendant," or "CRA Defendants," is an Ohio corporation that does business in this judicial district and may be served by delivering a summons to its headquarters, 475 Anton Blvd., Costa Mesa, California 92626. Experian is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Experian regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C.

§ 1681a(f) to third parties. Experian disburses such consumer reports to third parties of contract for monetary compensation.

5.      Upon information and belief, Defendant Trans Union LLC, which may also hereinafter be referred to as "Trans Union", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is an Illinois limited liability company that does business in this judicial district and may be served by delivering a summons to its headquarters, 555 West Adams Street, Chicago, Illinois 60681. Trans Union is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Trans Union regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation.

6.      Upon information and belief, Defendant Nationstar Mortgage LLC, successor by merger to Rushmore Loan Management Services or Mr. Cooper, which may also hereinafter be referred to as "Nationstar," "Rushmore/Nationstar," "Rushmore," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is a Delaware limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, 8950 Cypress Waters Blvd., Coppell, Texas 75019. Nationstar is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

7.      As used herein, "consumer reporting agency," or "CRA," means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports (commonly referred to as "credit

reports") to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports and is an entity in the business of collecting, maintaining and disseminating information regarding the credit-worthiness of individuals. CRAs specifically include, but are not limited to, Equifax, Experian, and Trans Union.

### III.  JURISDICTION AND VENUE

8.      Plaintiff respectfully asserts that this Honorable Court has jurisdiction in this case arising under federal law. 28 U.S.C. § 1331, 1334, and 1367 and 15 U.S.C. § 1681(p). Plaintiff also asserts actions under states' laws which may be brought within the supplemental jurisdiction of this Court and Plaintiff respectfully requests that this Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. § 1367.

9.      Venue is proper in this District, because CRA Defendants and Nationstar transact business in this District. Nationstar's headquarters is located in this judicial district, a substantial part of the conduct complained of occurred in this district, and various actions made basis of Plaintiff's claims against Defendants occurred in the Northern District of Texas as further described. 28 U.S.C. § 1391.

10.     Venue is further proper in this District, because CRA Defendants entered into agreements with Nationstar in this judicial district to receive credit reporting data concerning Plaintiff. Any and all requests to investigate Plaintiff's dispute(s) sent from the CRA Defendants as part of their reinvestigation was submitted to Nationstar's headquarters and investigated by the furnisher Nationstar using Rushmore/Nationstar's resources located at or closely connected to this judicial district. Nationstar managed Plaintiff's mortgage from this judicial district including communicating amounts owed and conducting numerous communications via phone and letter.

## IV.  FACTUAL ALLEGATIONS

11.     In October 2014, Plaintiff secured a mortgage loan with Roundpoint for real property located at 1444 Winchester Ave., Lincoln Park, MI 48146.

12.     In March 2017, Plaintiff secured a mortgage loan with Freedom Mortgage for 5 acres of land located at 3715 Haines Rd., Petersburg, MI 49270.

13.     On or around July 28, 2017, the Plaintiff filed for bankruptcy protection under Chapter 13 of Title 11.

14.     A redacted copy of Plaintiff's chapter 13 bankruptcy docket report for court file number 17-50901-tjt is attached hereto as Exhibit "A".

15.     Sometime thereafter, Rushmore Loan Management Services acquired Plaintiff's mortgage loan with Roundpoint for the real property located at 1444 Winchester Ave., Lincoln Park, MI 48146, and assigned loan number 102440xxxxxx (hereinafter the "Rushmore mortgage" or "Rushmore account" or "Rushmore tradeline").

16.     Sometime thereafter, Rushmore was sold, including all rights, liabilities, mortgage loan servicing responsibilities, and furnishing responsibilities, to Defendant Nationstar Mortgage LLC.

17.     Plaintiff's mortgage with Rushmore, was also sold to, transferred to, purchased by, or otherwise acquired by Nationstar Mortgage LLC.

18.     Sometime thereafter, Nationstar Mortgage LLC also acquired Plaintiff's mortgage loan with Freedom Mortgage for land located at 3715 Haines Rd., Petersburg, MI 49270, and assigned loan number 689617*** (hereinafter the "Nationstar mortgage" or "Nationstar account" or "Nationstar tradeline").

19.     On June 6, 2023, the Plaintiff was discharged from Chapter 13 Bankruptcy and

excepted from discharge Plaintiff's secured mortgage loans—the Rushmore mortgage and the Nationstar mortgage.

20.     A redacted copy of Plaintiff's chapter 13 Discharge Order is attached hereto as Exhibit "B" and incorporated herein by reference.

21.     Read in concert, Sections 1322(a)(2), 1322(b)(5), and 1328(a)(1) of the Bankruptcy Code, bar discharging home mortgage debts in a chapter 13 bankruptcy.

22.     Throughout Plaintiff's chapter 13 bankruptcy, under direct or indirect order from the bankruptcy, timely monthly mortgage payments were made to Plaintiff's residential home mortgage and the land mortgage loans—the Rushmore mortgage and the Nationstar mortgage.

23.     To this day, the Plaintiff still continues to make timely mortgage payments to the mortgage loans, and these have been the same loans the entire time since taken out in October 2014 and March 2017 respectively.

24.     Sometime in October 2023, Plaintiff pulled his credit reports for the major credit reporting agencies—Equifax, Experian, and Trans Union. Within the reports, Plaintiff noticed that there were reporting inaccuracies as they pertained to the Rushmore mortgage and his Freedom Mortgage account within his credit reports for some of the major credit reporting agencies—Equifax, Experian, and/or Trans Union.

25.     A redacted copy of Plaintiff's October 2023 tri-merge credit report is attached hereto as Exhibit "C".

26.     Within the Tri-Merge credit report, Plaintiff noticed that Equifax reported the following inaccuracies for Plaintiff's Freedom mortgage account: Equifax failed to update the reporting of the Freedom mortgage account after Plaintiff's chapter 13 bankruptcy was discharged; reported a date of last payment as June 1, 2017; reported an account status

"derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, and still making payments on the property before and after the transfer of the debt to Nationstar. *See* Exhibits "A", "B", and "C".

27.     Within the Tri-Merge credit report, Plaintiff noticed that Equifax also reported the following inaccuracies for Plaintiff's Rushmore mortgage: Equifax failed to update the reporting of the Rushmore mortgage after Plaintiff's chapter 13 bankruptcy was discharged; reported a date of last payment as July 1, 2017; reported an account status "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, and still making payments on the property before and after the transfer to Nationstar. *See* Exhibits "A", "B", and "C".

28.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's chapter 13 bankruptcy, was successfully discharged, and excepted his secured mortgage debts from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Rushmore mortgage and Freedom Mortgage tradelines after the chapter 13 bankruptcy was discharged.[1]

29.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically instruct furnishers and/or

---

[1] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

consumer reporting agencies to remove any referencing to a chapter 13 bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 bankruptcy, and then continued reporting once a consumer is discharged.

30.    Metro 2 guidelines have been adopted by Equifax as the industry standards, and these industry standards are followed by both furnishers and Equifax.

31.    Within the Tri-Merge credit report, Plaintiff noticed that Experian reported the following inaccuracies for Plaintiff's Freedom mortgage account: Experian failed to update the reporting of the Freedom mortgage account after Plaintiff's chapter 13 bankruptcy was discharged; reported nothing for a date of last payment; reported an account status "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, and still making payments on the property before and after the transfer of the debt to Nationstar. *See* Exhibits "A", "B", and "C".

32.    Within the Tri-Merge credit report, Plaintiff noticed that Experian also reported the following inaccuracies for Plaintiff's Rushmore mortgage: Experian failed to update the reporting of the Rushmore mortgage after Plaintiff's chapter 13 bankruptcy was discharged; reported nothing for a date of last payment; reported an account status "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, and still making payments on the property before and after the transfer to Nationstar. *See* Exhibits "A", "B", and "C".

33.    This reporting is incorrect because Plaintiff completed the required payments

through Plaintiff's chapter 13 bankruptcy, was successfully discharged, and excepted his secured mortgage debts from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Rushmore mortgage and Freedom Mortgage tradelines after the chapter 13 bankruptcy was discharged.[2]

34.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically instruct furnishers and/or consumer reporting agencies to remove any referencing to a chapter 13 bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 bankruptcy, and then continued reporting once a consumer is discharged.

35.     Metro 2 guidelines have been adopted by Experian as the industry standards, and these industry standards are followed by both furnishers and Experian.

36.     Within the Tri-Merge credit report, Plaintiff noticed that Trans Union reported the following inaccuracies for Plaintiff's Freedom mortgage account: Trans Union failed to update the reporting of the Freedom mortgage account after Plaintiff's chapter 13 bankruptcy was discharged; reported a date of last payment of November 29, 2021; reported an account status "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter

---

[2] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct the removal of any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, and still making payments on the property before and after the transfer of the debt to Nationstar. *See* Exhibits "A", "B", and "C".

37.     Within the Tri-Merge credit report, Plaintiff noticed that Trans Union also reported the following inaccuracies for Plaintiff's Rushmore mortgage: Trans Union failed to update the reporting of the Rushmore mortgage after Plaintiff's chapter 13 bankruptcy was discharged; reported a date of last payment of August 13, 2020; reported an account status "derogatory"; and reported within the creditor remarks section references to Plaintiff's chapter 13 bankruptcy, despite the Plaintiff having been discharged from chapter 13 bankruptcy, and still making payments on the property before and after the transfer to Nationstar. *See* Exhibits "A", "B", and "C".

38.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's chapter 13 bankruptcy, was successfully discharged, and excepted his secured mortgage debts from being discharged; therefore, any remarks and/or references to a chapter 13 bankruptcy should have been removed from the Rushmore mortgage and Freedom Mortgage tradelines after the chapter 13 bankruptcy was discharged.[3]

39.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed chapter 13 bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a

---

[3] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

consumer is discharged, Metro 2 reporting standards specifically instruct furnishers and/or consumer reporting agencies to remove any referencing to a chapter 13 bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's chapter 13 bankruptcy, and then continued reporting once a consumer is discharged.

40.     Metro 2 guidelines have been adopted by Trans Union as the industry standards, and these industry standards are followed by both furnishers and Trans Union.

41.     On or about November 3, 2023, Plaintiff sent direct disputes to Equifax, Experian, and Trans Union, and requested that the CRAs investigate the reporting of the Rushmore mortgage and Freedom Mortgage accounts, and Plaintiff specifically addressed the above referenced issues with the reporting stated in the above Paragraphs. Plaintiff requested that under the FCRA, the CRAs conduct reasonable investigations and/or remedy the inaccuracies on Plaintiff's credit reports concerning the Rushmore mortgage and Freedom Mortgage accounts.

42.     Redacted copies of Plaintiff's unsigned dispute letters sent to Equifax, Experian, and Trans Union are attached as Exhibits "D", "E", and "F", and are respectively incorporated in by reference.

43.     Equifax responded to Plaintiff's dispute on December 5, 2023.

44.     A Redacted copy of Equifax's response is attached hereto as Exhibit "G" and incorporated herein by reference.

45.     Equifax's response showed that Equifax deleted Plaintiff's Rushmore mortgage account from Plaintiff's Equifax consumer report.

46.     Equifax's response also showed that Equifax deleted Plaintiff's Freedom

Mortgage account from Plaintiff's Equifax consumer.

47.    Based on Equifax's response to Plaintiff's dispute, it was apparent that Equifax made none of the substantive changes Plaintiff requested in the direct dispute, failed to update the either the Rushmore mortgage account or the Freedom Mortgage account after the chapter 13 bankruptcy was discharged, unilaterally or inadvertently deleted the Rushmore mortgage account, and unilaterally or inadvertently deleted the Freedom Mortgage account.

48.    Equifax's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the Rushmore mortgage and Freedom Mortgage accounts and gave no explanation as to why the Rushmore mortgage and the Freedom Mortgage accounts were deleted.

49.    In the alternative, Equifax failed to contact furnishers Rushmore and/or Freedom Mortgage, therefore, failed to perform any investigation at all.

50.    In the alternative to the allegation that Equifax failed to contact the furnishers, it is alleged that Equifax did forward some notice of the dispute to the furnishers, and Rushmore failed to conduct a lawful investigation.

51.    Experian responded to Plaintiff's dispute on November 28, 2023.

52.    A Redacted copy of Experian's response is attached hereto as Exhibit "H" and incorporated herein by reference.

53.    Experian's response showed that Experian deleted Plaintiff's Rushmore mortgage account from Plaintiff's Experian consumer report.

54.    Experian's response also showed that Experian failed to accurately update Plaintiff's Freedom Mortgage account and continued to report references to Plaintiff's Chapter 13 Bankruptcy.

55.     Based on Experian's response to Plaintiff's dispute, it was apparent that Experian made none of the substantive changes Plaintiff requested in the direct dispute, failed to update either the Rushmore mortgage account or the Freedom Mortgage account after the chapter 13 bankruptcy was discharged, unilaterally or inadvertently deleted the Rushmore mortgage account, and continued to report references to the chapter 13 bankruptcy on Plaintiff's Freedom Mortgage account.

56.     Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the Rushmore mortgage and Freedom Mortgage accounts and gave no explanation as to why the Rushmore mortgage account was deleted and the Freedom Mortgage account was still reporting inaccurately.

57.     In the alternative, Experian failed to contact furnishers Rushmore and/or Freedom Mortgage, therefore, failed to perform any investigation at all.

58.     In the alternative to the allegation that Experian failed to contact the furnishers, it is alleged that Experian did forward some notice of the dispute to the furnishers, and Rushmore failed to conduct a lawful investigation.

59.     Trans Union responded to Plaintiff's dispute on December 6, 2023.

60.     A redacted copy of Trans Union's response is attached hereto as Exhibit "I" and incorporated herein by reference.

61.     Trans Union's response showed that Trans Union deleted Plaintiff's Rushmore mortgage account from Plaintiff's Trans Union consumer report.

62.     Trans Union's response also showed that Trans Union failed to accurately update Plaintiff's Freedom Mortgage account and continued to report references to Plaintiff's Chapter

13 Bankruptcy.

63.    Based on Trans Union's response to Plaintiff's dispute, it was apparent that Trans Union made none of the substantive changes Plaintiff requested in the direct dispute, failed to update either the Rushmore mortgage account or the Freedom Mortgage account after the chapter 13 bankruptcy was discharged, unilaterally or inadvertently deleted the Rushmore mortgage account, and continued to report references to the chapter 13 bankruptcy on Plaintiff's Freedom Mortgage account.

64.    Trans Union's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the Rushmore mortgage and Freedom Mortgage accounts and gave no explanation as to why the Rushmore mortgage account was deleted and the Freedom Mortgage account was still reporting inaccurately.

65.    In the alternative, Trans Union failed to contact the furnishers Rushmore and/or Freedom Mortgage, therefore, failed to perform any investigation at all.

66.    In the alternative to the allegation that Trans Union failed to contact the furnishers, it is alleged that Trans Union did forward some notice of the dispute to the furnishers, and Rushmore failed to conduct a lawful investigation.

### V.    GROUNDS FOR RELIEF

#### COUNT I – EQUIFAX'S VIOLATION OF THE FCRA
#### (15 U.S.C. § 1681e(b))

67.    Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

68.    Equifax violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiff.

69.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

70.    Equifax knew or should have known Plaintiff's account status in relation to Plaintiff's bankruptcy was inaccurate, but Equifax continued to prepare a patently false consumer report concerning Plaintiff.

71.    Despite actual and implied knowledge that Plaintiff's credit report was and is not accurate, Equifax readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

72.    After Equifax knew or should have known Plaintiff's account status in relation to Plaintiff's bankruptcy was inaccurate, they failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

73.    As a result of Equifax's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in

Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

74.     Equifax's conduct, action, and inaction, were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

75.     The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT II – EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

76.     The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

77.     Equifax violated 1681i by failing to update inaccurate information in the Plaintiff's credit file after receiving actual notice of such inaccuracies, failing to conduct a lawful

reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file, and relying upon verification from a source it has reason to know is unreliable.

78.    As a result of Equifax's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair

Plaintiff's credit in light of the damage done to it continuously by Defendant.

79.     Equifax's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

80.     The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT III – EXPERIAN'S VIOLATION OF THE FCRA
### (15 U.S.C. § 1681e(b))

81.     The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

82.     Experian violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiff.

83.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

84.     Experian knew or should have known of Plaintiff's account status in relation to Plaintiff's bankruptcy was inaccurate, but Experian continued to prepare a patently false consumer report concerning Plaintiff.

85.     Despite actual and implied knowledge that Plaintiff's credit report was and is not accurate, Experian readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

86.    After Experian knew or should have known Plaintiff's account status in relation to Plaintiff's bankruptcy was inaccurate, they failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

87.    As a result of Experian's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain

the false and defamatory information; and the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

88.     Experian's conduct, action, and inaction, were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

89.     The Plaintiff is entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT IV – EXPERIAN'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

90.     The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

91.     Experian violated 15 U.S.C. § 168li on multiple occasions by failing to update inaccurate information in the Plaintiff's credit file after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to the furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file, and relying upon verification from a source it has reason to know is unreliable.

92.     As a result of Experian's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional

distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

93.    Experian's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

94.    The Plaintiff is entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT V – TRANS UNION'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

95.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out

herein.

96.     Trans Union violated 15 U.S.C. § 1681e(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiff.

97.     The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

98.     Trans Union knew or should have known of Plaintiff's bankruptcy status, history, and/or payment history were reporting inaccurately, and yet, Trans Union continued to prepare a patently false consumer report concerning Plaintiff.

99.     Despite actual and implied knowledge that Plaintiff's credit report was and/or is not accurate, Trans Union readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

100.    After Trans Union knew or should have known Plaintiff's bankruptcy status, history, and/or payment history were inaccurate for Plaintiff's mortgage tradeline(s), it failed to make the corrections as would be required to attain "maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b).

101.    As a result of Trans Union's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost

credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

102.    Trans Union's conduct, action, and inaction, were willful, rendering it liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction were negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

103.    The Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

**COUNT VI– TRANS UNION'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**

104.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

105.    Trans Union violated 15 U.S.C. § 1681i on multiple occasions by failing to update or correct inaccurate information in the Plaintiff's credit file after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit file, and relying upon verification from a source it has reason to know is unreliable.

106.    As a result of Trans Union's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but

not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendant.

107.    Trans Union's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

108.    The Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT VII – NATIONSTAR'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681s-2(b))

109.    Defendant Nationstar violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiff's dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

110.    Nationstar further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Rushmore mortgage within Plaintiff's credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiff's dispute of the Rushmore mortgage, failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer

reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of inaccurate information to the Nationstar and/or Rushmore mortgage within the consumer reporting agencies reports.

111.    As a result of Nationstar's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to: loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendant to comply with Defendant's statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendant; loss of self-esteem because of Defendant's continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; and the costs and time Plaintiff has spent trying to repair

Plaintiff's credit in light of the damage done to it continuously by Defendant.

112.    Nationstar's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

## VI.  VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

113.    Plaintiff will be able to show, after reasonable discovery, that all actions at issue were taken by employees, agents, servants, or representatives, of any type, for Defendants, the principals, within the line and scope of such individuals' (or entities') express or implied authority, through employment, agency, or representation, which imputes liability to Defendants for all such actions under the doctrine of respondent superior and/or vicarious liability.

## VII. DAMAGES

114.    Plaintiff respectfully requests that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of the FCRA and/or states' laws, including Texas.

115.    Plaintiff respectfully requests that this Honorable Court award Plaintiff his litigation expenses and other costs of litigation and reasonable attorney's fees incurred in this litigation, in accordance with the provisions of the FCRA and/or other laws.

116.    The above and foregoing actions, inactions, and fault of Defendants, as to each and every claim, have proximately caused a wide variety of damages to Plaintiff.

117.    Defendants performed perfunctory and essentially useless reinvestigations resulting in the verification of false reportings about the Plaintiff and have been a substantial

factor in causing credit denials and other damages.

118.    Plaintiff suffered a variety of damages, including economic and non-economic damages as prayed for herein.

119.    Defendants have negligently and/or willfully violated various provisions of the FCRA and are thereby liable unto Plaintiff.

120.    Defendants are liable unto Plaintiff for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to: out-of-pocket expenses; credit denials; loss in Plaintiff's ability to finance goods; loss of credit, loss of the ability to purchase and benefit from credit; emotional anguish, frustration, and annoyance from being deterred from applying for credit; mental anguish, humiliation, anger, frustration, annoyance, and embarrassment as a result of the publication of false information; lost credit capacity and decreased credit scores; damage to reputation; mental anguish, emotional distress, frustration, humiliation, and annoyance as a result of being burdened with a false credit reporting history; lost opportunities to obtain credit in the form of an unspecified number of credit offers that Plaintiff did not receive because of the false and derogatory information contained in Plaintiff's credit report; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff has on current loans; Plaintiff's lowered credit score may have impacted the interest rates Plaintiff received during this ordeal; Plaintiff's lowered credit score may have impacted the credit limits Plaintiff has on existing accounts; Plaintiff's spent considerable time, effort, and expense attempting to force Defendants to comply with Defendants' statutory obligations, including but not limited to reviewing information online, telephone calls, emails, writing letters, sending letters, and attempting to decipher letters, reports, and other instruments provided by Defendants; loss of self-esteem because of Defendants'

continued persistence in painting Plaintiff in a false light both personally and financially; anxiety when considering seeking additional credit because Plaintiff believes Plaintiff will be forced to be subjected to the humiliation of having to explain the false and defamatory information; the costs and time Plaintiff has spent trying to repair Plaintiff's credit in light of the damage done to it continuously by Defendants; attorney's fees; court costs; and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PREMESIS CONSIDERED**, Plaintiff prays that this Honorable Court:

A.     Enter Judgment in favor of Plaintiff and against Defendants Equifax, Experian, Trans Union, and Nationstar, jointly, severally, and in solido, for all reasonable damages sustained by Plaintiff, including, but not limited to, actual damages, compensatory damages, out-of-pocket expenses, credit denials, costs and time of repairing his credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, and fear of personal and financial safety and security for Defendants' violations of the FCRA, applicable state law, and common law;

B.     Find that the appropriate circumstances exist for an award of punitive damages to Plaintiff;

C.     Award Plaintiff pre-judgment and post-judgment interest, as allowed by law;

D.     Order that CRA Defendants, Equifax, Experian and Trans Union LLC, and Furnisher Defendant, Nationstar, work in conjunction, cooperatively, and/or individually to reinvestigate and correct the consumer report(s), credit report(s), data emanations, consumer histories, and credit histories of and concerning Plaintiff and/or any of Plaintiff's personal identifiers.

E.      Grant such other and further relief, in law or equity, to which Plaintiff might show he is justly entitled.

Date Filed: <u>February 14, 2024</u>

<div style="margin-left: 40%">

Respectfully submitted,

<u>/s/ Blake R. Bauer</u>
Blake R. Bauer
MN Bar Number 0396262
FCRA-TX@fieldslaw.com
FIELDS LAW FIRM
9999 Wayzata Blvd.
Minnetonka, Minnesota 55305
(612) 206-3489 (telephone)
(612) 370-4256 (fax)

***Lead Counsel for Plaintiff***

By: <u>/s/ Jonathan A. Heeps</u>
Jonathan A. Heeps
State Bar No. 24074387
LAW OFFICE OF JONATHAN A. HEEPS
*Of Counsel to* FILEDS LAW FIRM
Post Office Box 174372
Arlington, Texas 76003
Telephone (682) 738-6415
Fax (844) 738-6416
jaheeps@heepslaw.com

***Local Counsel for Plaintiff***

***COUNSEL FOR PLAINTIFF***

</div>

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

February 14, 2024                                    /s/ Blake R. Bauer
Date                                                         Blake R. Bauer